1971 Cousin v. O'Rourke Mr. Dufresne, please proceed. Thank you, Your Honors.  This appeal presents a clear-cut legal issue. That is whether or not the Veterans Court used the correct legal standard to identify a defect under the applicable regulation in this case. Did the board or the Veterans Court interpret any statute or regulations? Because you need that for O'Brien. So I don't believe that they expressly interpreted the regulation, the 1946 regulation. Your Honor, our argument is that they didn't apply any standard in this case, which is also a legal error under Willsey and other cases. And that gets you into O'Brien. I think it does, Your Honor, because the meaning of the defect term was dispositive in O'Brien. The court had applied the wrong definition. That's right. Here, they failed to apply any definition. And in either case, it resulted in an error in the Veterans Court's analysis of the board's decision and the board's analysis on the Q claim. The question, Mr. Dufresne, is whether there was Q in the 1954 rating decision, correct? That's what we're. That's the ultimate question at the end of the day. Right here before this court, I think, is the issue of whether there was any error in the Veterans Court's analysis of the board's analysis of that issue. If the law was wrongly interpreted in the 1954 decision, would that be Q if they stated the law inaccurately? I believe that would be Q. Q can arise from the agency's failure to consider evidence that was properly before it or the agency's error in applying the correct law that existed at the time. So if the agency in 1954 had applied the wrong definition for defect in its analysis, that would be Q if that error changed the outcome. And the government argues, well, they may have interpreted the facts of this case as a defect. And isn't your argument, well, I know your argument is they didn't use any standard. But assuming that the government is right, that they used some standard keying in on injury versus defect, wouldn't your argument be that they interpreted the law wrong? Because what this veteran has is not a defect. It's a disease or injury. I think that's correct. It's not disputed that the condition that Mr. Cousin has, spondylolisis, is a degenerative condition, which could not be a defect under that definition. The government adopted your statement of facts below expressly and unequivocally in their brief and repeated that on appeal in a footnote to us. And you asserted in multiple places below that spondylolisis is a degenerative condition, correct? That's correct. So if the rating official who decided this case in 1954, if he was aware of the diagnosis of spondylolisis, which was present in 1953 x-ray notes, and if the government conceded spondylolisis is a degenerative condition, then the only way this rating officer could have, if he considered all of that evidence, come out the way he did was if he interpreted the word defect in the regulation at the time as including degenerative conditions, correct? I think that's right. I think that's right. Do you have anything else you want to say? If the court has no further questions, I could reserve the rest of my time. Do you interview your client? Did you talk to your client? Yes, many times, Your Honor. Did you ever ask him what it was like to move an ash can? He said they were quite heavy. He moved a lot of them and injured his back pretty badly when he was doing that. Mr. DeFran, let me ask you. I think where I am on the case, to me it's a difficult case in one respect. I agree that if the O'Brien case applies, I think you have a very strong case. OK. But to me, there seems to be a question, possibly, of retroactivity here. Because in O'Brien, if you look at O'Brien, you have the Jordan case, which the government relies on. And Jordan would stand for the proposition in this case that you don't apply the general counsel's opinion, which we endorsed in O'Brien, retroactively. I think the government's argument is that Jordan says that. And what I'm trying to wrestle with is, how do we resolve the question of retroactivity here? Because on the face of it, it would seem that Jordan and O'Brien are inconsistent. They both have the same factual scenario of somebody, acute decision, then a subsequent change. And I'm wondering how we resolve that here. Because there is that law that says, when we have apparently conflicting cases, we try and resolve the conflict. Or if we can't, we go with the earlier case. In O'Brien, as far as I can tell, in looking at the briefs in O'Brien, nobody argued the issue of retroactivity. And Jordan wasn't cited. And in oral arguments, there was no discussion of retroactivity. So I guess that leaves me with the feeling that doesn't Jordan control. Bottom line for me is, I think if O'Brien controls along the line of your colloquy with Judge Moore, I think you prevail. But what's bothering me is this retroactivity point. Because in O'Brien, they said the regulation was ambiguous. So assume it was spondylosis, but it was always spondylosis with all its conditions. But only when the general counsel spoke was it determined that that kind of a degenerative condition was not a defect. I apologize for rambling, but I thought it was the only way to get this retroactivity issue out. What is your response to that, if you understand my rambling? So I think I appreciate Your Honor's concern. And I think there's a critical difference between Jordan and O'Brien that's also evident here in this case. And I don't think there's actually a retroactivity issue here in this case. Because like in Jordan, we have a regulation that at the time of the original decision had not been authoritatively construed. And that's in contrast to Jordan, where at the time of the original decision in Jordan, there was a regulation that had construed the statute that was at issue in Jordan. And so that regulation was the effective binding construction of that statute at the time of the original decision in Jordan. And then when that regulation was later revoked in Jordan, that was a change in the law. And so that change was not retroactive and did not affect final judgments. Because at the time of the judgment, the original final judgment in Jordan, there had been a binding construction of the statute at issue. I think you're stressing my recollections. You've accurately set forth the factual setup in Jordan and in this case. But the one thing is, you do have the statement in O'Brien that the regulation here was ambiguous. O'Brien said that the regulation that we're dealing with here was ambiguous. So you have the board in 1954 addressing what we've said is an ambiguous regulation. And later, in 1985, that ambiguity being removed by the action of the general counsel. So even though it's a little bit different, still it would seem that there is that retroactivity component in there. Well, I think the ambiguity was ultimately resolved by this court when the decision in O'Brien was issued. Right, yeah, that's true. I agree. But the ambiguity existed. In other words, what I'm getting at, why if in 1954 the rating office, RO, was faced with a ambiguous regulation and it ruled the way it did, why do we say there was Q? Because Q, you have to look at what the law was at the time, and the board was faced with, I'm sorry, the RO was faced with an ambiguous reg, and it did the best it could with it. And it turned out that its interpretation was wrong, I think, Your Honor. I think if you look at the interpretation that was ultimately perceived to be correct in O'Brien, if you assume that the AOJ at the time of the original decision in 1954 came to a different conclusion and concluded that something that's congenital, for example, can be a defect or is necessarily a defect, that was held to be incorrect in O'Brien. So even if you assume that that regulation was ambiguous at the time, the interpretation that is imputed to the 1954 decision would be incorrect under O'Brien. So if I understand you right, what you're suggesting is that at no time has the government ever alleged that the word defect included degenerative conditions. Isn't that right? I mean, not just the general counsel's opinion said affirmatively it doesn't, but there's never been a case that I'm aware of or any announcement where the government has said it does. So there is no conflict in the later holding that's overruling the earlier one. Is that correct? That's right. I don't think the government's argued that in this case either. And in addition to that, isn't it the case that while we found it's ambiguous, we would not have permitted a plainly erroneous conclusion? And nothing in O'Brien suggests that the government had the choice to come out either way, and it wouldn't have been plainly erroneous if they had come out the other way, right? That's correct. And in fact, so this court in O'Brien did cite Auer and talked about the general counsel's opinion, but also took time on 1380, 771, 1380, made a point to say that the interpretation was actually reasonable. So it did an independent look at the regulation and the construction that was proposed. OK. Do you want to save your rebuttal time? Yes, Your Honor. Thank you. OK. Let's hear from the government. Ms. Parr. May it please the court. First, to get to your question. No, no. No, no. First, you answer my question. Yes, Judge Wallet. Does the government know what an ashcan is? No, Your Honor. I do not know exactly what an ashcan is from 1952. An ashcan from 1952 is a metal can, probably a 55-gallon oil drum, or a large garbage can the same size, filled with the ash from the coal-fired furnaces that were used in the training facilities and for all troops in 1952. And were still used in 1969 when I went in the Army. And I couldn't lift one at the time. Now, the reason I say that is there's a presumption that when Mr. Cousins went in the service, his pre-induction physical showed that his back was normal and he was entitled to a presumption of soundness and aggravation, right? Correct. OK. If he had a bad back, why was the government assigning him to lift those ashcans? I do not have an answer for that, Your Honor. Wasn't the government assuming that he had a strong back when it made those assignments? If Mr. Cousin, at the time of his entry into the service, said he did not have a back problem, then it would assume that he had a solid back, strong back. On page 23 of your red brief, you argue to us, indeed, even the March 1953 x-ray notes could be read that Mr. Cousin had probably or likely spondylosis. Are you asking us to make a fact finding about what those x-ray notes could be read to say? No, Your Honor. Are we permitted to change a board fact finding that was made about what they say? No, Your Honor. Did the board find expressly that those exact x-ray notes diagnosed him with a condition of spondylosis? Yes, Your Honor. Yes, they did, on page A19 of the appendix. So the board has made an affirmative fact finding that he was diagnosed in that exact same x-ray note with spondylosis. So why is the government arguing to me on appeal that I should nonetheless interpret that record as probably or likely concluding he had spondylosis? Is that within my jurisdiction to do? No, Your Honor, you cannot make a factual determination. Why are you telling me to do that in this brief? What I was attempting to point out to the court was that the- That the board got the fact finding wrong when they said that that exact same note diagnosed him with spondylosis? No, but when the board stated- The board might have gotten it wrong? When the board stated that the veteran had spondylosis- No, you said that that note diagnosed him as having spondylosis. That note also, which is at appendix page, I may pull it up, I believe it is at page- 321. 321, thank you, Your Honor. Also notes a pedicle defect. Correct. And based upon this x-ray- The board interpreted that note on page 321 and said it revealed a defect diagnosed as spondylosis. Yes, Your Honor. So he was diagnosed with spondylosis. But that note also explained that Mr. Cousin had a pedicle defect and further the decision- I do not understand how you could insert the words probably or likely in your brief to us trying to get me to somehow disregard the board's express fact-finding that he- No, Your Honor, and I apologize if that is the way it came out. We are not attempting to get the court to make a fact-finding because certainly, and that's why this court lacks jurisdiction- Not just make a fact-finding, but reverse a board's express fact-finding. We are not requesting that this court reverse the board's fact-finding. We are requesting that the court find that it has no jurisdiction because the fact-finding of the board determined that Mr. Cousin, there was sufficient reason that a reasonable person- The fact-finding of the board was he was diagnosed with spondylosis, correct? Yes, Your Honor. Below, you conceded that spondylosis is a degenerative condition, correct? Yes, Your Honor. So when the rating officer decided in 1954 that he wasn't entitled to benefits, despite the facts being that he had spondylosis, which you have admitted is a degenerative condition, is, aren't they necessarily interpreting the word defect, therefore, as including degenerative conditions? Your Honor, the 1954 board noted in its decision  upon the time of his departure and that he was diagnosed- He was on light duty, was he not? I'm, pardon, Your Honor? He was on, he had what they call a permanent profile. He was on permanent light duty. Yes, Your Honor. You think the Army in 1952 let people get permanent profiles as a regular thing? I simply don't know that answer, Your Honor. However, Mr. Cousin was shown as asymptomatic at discharge, regardless of his permanent profile. He was not experiencing any back symptoms at the time of his departure. That's because he's not doing anything. That may be the case, Your Honor. But here, and to get to your point, Judge Moore, whether the 1954 board interpreted spondylosis as a defect or a disease is not, will not manifestly change the outcome of this case. Because Mr. Cousin was asymptomatic at discharge. As Your Honor correctly noted multiple times, this court does not have the jurisdiction to reconsider fact findings. And to interpret whether the board's decision, which explicitly found that Mr. Cousin being asymptomatic at discharge, and that the 1954 RO, which included a physician who presumptively reviewed these records, including the 1953 x-ray, concluded that Mr. Cousin did not have a service connection. He had a degenerative disease by the government's admission. And you would like me to interpret the 1954 rating. I mean, I don't see how to interpret it other than the word defect, which is the only way he is not compensable under these circumstances, includes degenerative conditions. Is the government alleging that it would have been reasonable in 1954 for the rating officer to conclude that defects include degenerative conditions? I've never seen the government take that position. In fact, it's taken the opposite position in every case I can find going way back. But are you now telling me it would have been reasonable, it would not have been plainly erroneous, if this particular rating officer decided that defects do, in fact, include degenerative conditions? What the government is asserting is that considering the record as a whole, with the benefit of the physician having reviewed all of the records, including the 1953 x-ray, which stated pedicle defect as well as spondylosis, that a reasonable fact finder could determine, as the 1954 RO did, that Mr. Cousin did not have a service-related connection. Are you not going to answer the question? I apologize if I did not answer the question. The question was defect and its definition, not the record as a whole. The government does not contend that spondylosis is a defect. But even assuming the, as Judge Schall noted, the ambiguous statute back in, or pardon me, regulation back in 1954, Mr. Cousin cannot show that there would be a manifestly different result, regardless of whether defect or disease was applied. Mr. Cousin, you accepted all his statements of fact, correct? The statements of facts he made in his brief before the Veterans Court, the government said in its brief, they accept as true all of his statements of fact, correct? That is what the government's brief said. Let me read the fact from his brief at page 822. In the months and years that followed, Mr. Cousin's continued to experience back trouble and degenerative changes as a result of this service condition. You accepted that as true, that is in his statement of facts, the portion that you expressly accepted as true. So why don't I hold the government to the concession that he wasn't OK from 1954 forward, but rather that, as Mr. Cousin's alleged, which you conceded, he continued in the months and years immediately following his deconnection from service to have these back troubles? Because, Your Honor, the board also went through all of Mr. Cousin's records and held that the 1954 R.O. could have reasonably concluded, as it did, with the benefit of all of Mr. Cousin's records. Looking at the record as a whole, including Mr. Cousin's medical records, does not show that Mr. Cousin presented multiple times with back symptoms between 1954 and, I believe, the first time that he requested service connection in 1979. And while Mr. Cousin certainly has, at times, presented with back problems and has gone to the VA with that, there was no service connection until December 2012, which was based upon a December 2012 medical opinion by the VA, which clearly was not in front of the 1954 R.O. Ms. Murnau-Park, let me ask you, if I could, please. You heard my colloquy with Mr. Dufresne, and you heard the chief's colloquy, the presiding judge's colloquy with Mr. Dufresne. Where I am is that if O'Brien is what we're living by here, I think you're kind of out of luck in the case. But I'm wondering about this question of retroactivity. You haven't talked about that, maybe because you either didn't get a chance to just now or because you don't feel that strongly about it. What is your view on the retroactivity point that I was raising? I mean, don't hesitate to tell me if you think it doesn't go anywhere. But it just struck me as an issue in the case, and I was wondering what you thought about it. Your Honor is correct, and Jordan does apply here. The first time that the term defect was authoritatively construed, as Mr. Cousin concedes in his reply brief at page 8, was in O'Brien. And the 1985 general counsel opinion was the first time that there was a legal interpretation of what constitutes a defect. And that 1985 general counsel opinion cannot be retroactively applied 30 years in the past to- Well, I think, and I don't want to, but as I recall, in response to that, well, the government has never, the government agrees that it was always a degenerative disease. So I think her colloquy with Mr. Dufresne, and I can be corrected, the thrust of it was that it's always been a degenerative disease, so that this general counsel's opinion in 1985 doesn't make any difference. Did you understand that to be the tenor of their discussion? I did, Your Honor. And the- What's your answer to that? My answer, and I hope this does answer the question, is that regardless of how the term defect is applied, even assuming that the 1985 general counsel opinion should be applied, a manifestly different result does not occur applying that definition of defect. The 1946 regulation that was in place at the time of the decision explains that, yes, a defect is a non-compensable, is non-compensable. And Mr. Cousin's medical records have sufficient murkiness, if you will, that demonstrate a reasonable fact finder could determine, as the 1954 R.O. did, that he could have had a defect. So do you think there's a tension between Jordan and O'Brien? Well, I think simply here, Your Honor, O'Brien does not apply. The facts are very different. Mr. O'Brien, for example, was completely blind within one year of leaving the service, whereas Mr. Cousin did not know any other back problems for 25 years. So you're saying we don't have to worry about a conflict between Jordan and O'Brien and try to resolve it, in your view? Your Honor, I don't think the court needs to reach that, because I don't believe that O'Brien applies. And the question that Mr. Cousin raises as to whether or not certain facts were considered in the record are beyond this court's jurisdiction. Let me read back to you. Mr. O'Brien was completely blind within a year of leaving the service, whereas Mr. Cousin did not have any back problems for 25 years. I think that's a verbatim, your statement. Yes, Your Honor. Now let me read to you from page 22 of the appendix, which you accepted as factually true. Yes, less than a year later, however, Mr. Cousin filed his first claim for disability compensation relating to his in-service back injury. In the months and years that followed, Mr. Cousin continued to experience back trouble and degenerative changes as a result of service. And then there's 15 or so references. How can you square those two statements? Because, Your Honor, months, depending on how you determine months, months could be 120 months, 240 months. Mr. Cousin has pointed to nothing in the record that shows between the time of the initial service claim, or the initial time that Mr. Cousin was diagnosed with a back injury and when he attempted to reopen his claim in 1979, that there are any medical records showing that he had further service-related injuries, including that crucial time period between 1952 and 1954. And while, certainly, Mr. Cousin, as the government concedes, did have back problems in the months and years that followed, I do not interpret that as stating that the months are necessarily within one to two months after he left the service, nor within one year, as within Mr. O'Brien's case when he went completely blind. In July 1954, Mr. Cousin filed his first claim for VA compensation for his back condition, indicating that his disability had begun in 1952, and specifically identifying the treatment he received while in service in 1952 and 1953. That seems like months to me. But that was also before the decision. And while he may have filed in 1954 for his claim, he was discharged from the military in, I believe it was September 1954. And certainly, if he was put on permanent disability, he would file for a claim within one year of that occurring. OK. We're out of time. Mr. Dufresne, do you have anything you'd like to add on rebuttal? Thank you, Your Honor. I'd just like to touch quickly on a couple points and answer any of them. I'd like you to clarify the time period for me. Certainly, Your Honor. Which time period are you using? The one upon which I've been stressing the government's, from the time of his discharge till 1979. So Mr. Cousin was honorably discharged in September of 1953. At that point, he was subject to what the VA itself called a permanent physical profile that limited him from doing fundamental. I'm aware of it. I know what you mean. We used to call it smoking and joking. That's a new one to me, Your Honor. The first benefits application he filed was less than a year later in July of 1954. That claim was denied in December of 1954. And Mr. Cousin filed on several occasions over the ensuing 60 years trying to reopen that claim. When you say several, was there one before 1979? The first one after 1954 was in 1979, Your Honor. There was some discussion about the question of whether Mr. Cousin had a disability that was evident in the time between his discharge and his initial application for benefits in 1954. That question has been undisputed in this case. It was not disputed before the Veterans Court. The government's bringing that as an argument for the first time on appeal here. We think that's inappropriate. It's also inconsistent with the permanent profile that Mr. Cousin was assigned at the time of his discharge. Whether or not he was symptomatic at the time of discharge, I think that was because the treatment he was prescribed was working. So the permanent profile kept him from doing these activities like bending and lifting. And so it's perhaps not surprising that he was asymptomatic. But in his post-military life, any time he engaged in those activities, he had back problems again. So if we find Q in this instance, or at least if we find that there was an error of law in the 1954 rating decision, namely in the interpretation of the word defect as necessarily including degenerative conditions in light of the government's concessions with regard to the facts, what happens? Do we reverse, or do we vacate and remand? And what else would need to be done? So I would say that's within this court's discretion. The court could certainly vacate and remand for further proceedings before the board. In a case like this, I think the court has discretion to proceed and resolve the issue when there's an undisputed record and the result is clear if the correct law is applied. And I think that- This would be a unique case because there are government concessions regarding the facts. Right, I agree with that, Your Honor. And I think this would be prudentially and especially appropriate case to consider outright reversal because my client is 89 years old. He's been waiting more than 60 years for these benefits. And if he dies, I bet those benefits go up in smoke, don't they? I believe his wife might be able to collect them, but she's also at an advanced age as well. So that could ultimately occur. And as the court knows, the VA's adjudication process is not known for its speed. So this might be a case where reversal would be appropriate. Okay, thank you very much. We thank both counsel. The argument is taken under submission.